EFFRON, Judge
(concurring in part and dissenting in part):
For the reasons set forth below, I agree that the Charge, in light of the bill of particulars, was sufficient to state an offense and provide fair warning of the criminality of the conduct at issue. I do not agree that the evidence was sufficient to prove the offense alleged.
I. Legal Sufficiency of the Charge
Article 133, UCMJ, 10 USC § 933, proscribes “conduct unbecoming an officer and a gentleman.” The Supreme Court, in Parker v. Levy, 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), indicated that such a statute might be void for vagueness under the standards applicable to criminal offenses in the civilian sector. The statute could be sustained in the military context, however, so long as the person had received “fair warning of the criminality” of his or her conduct. The Court relied in significant part on the decisions of this Court and the language in the Manual for Courts-Martial that had “narrowed the very broad reach of the literal language of the articles, and at the same time ha[d] supplied considerable specificity by way of examples of the conduct which they cov *259 er.” Id. at 753-54, 94 S.Ct. 2547. The Court also noted that “further content may be supplied ... by less formalized custom and usage.” Id. at 754, 94 S.Ct. 2547. The guidance in the Manual for Courts-Martial plays a vital role in the assessment of the legality of the Charge. With respect to the offense of conduct unbecoming an officer and a gentleman under Article 133, the Manual notes:
There are certain moral attributes common to the ideal officer and the perfect gentleman____ Not everyone is or can be expected to meet unrealistically high moral standards, but there is a limit of tolerance based on customs of the service and military necessity below which the personal standards of an officer, cadet, or midshipman cannot fall without seriously compromising the person’s standing as an officer, cadet, or midshipman or the person’s character as a gentleman. This article prohibits conduct by a commissioned officer, cadet, or midshipman which, taking all the circumstances into consideration, is thus compromising.
Para. 59c(2), Part IV, Manual for Courts-Martial, United States (2000 ed.). The Manual reflects traditional military law. Winthrop, in his authoritative treatise, noted with respect to an earlier version of the statute:
Though it need not amount to a crime, it must offend so seriously against law, justice, morality or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents.
William Winthrop, Military Law and Precedents 711-12 (2d ed.1920 Reprint) (footnote omitted).
The comments by the President in the Manual and Winthrop in his treatise reflect two tiers of disciplinary infractions under military law. The first tier includes matters that amount to flaws or deficiencies in performance or conduct that are not crimes, either in the traditional or uniquely military sense. See generally United States v. Wheatley, 10 USCMA 537, 28 CMR 103, 1959 WL 3414 (1959)(careless or thoughtless act of officer not necessarily criminal). Infractions not amounting to UCMJ offenses may be addressed through administrative measures, such as those listed in ROM 306(c)(2), Manual, supra, and the Discussion thereunder. The second tier includes matters that not Only involve deficiencies in performance or conduct, but which also constitute offenses under the UCMJ. These matters can be dealt with either under the UCMJ or through administrative actions. See RCM 306(c)(1)—(5), 401-04, and 407.
The Manual expressly addresses the subject of officer-enlisted relationships in paragraph 83, Part IV (Fraternization), providing a basis for differentiating between those relationships that are punishable under the UCMJ and those that are either permissible or that may be addressed solely through administrative measures. The Manual, however, does not provide similar guidance with respect to the relationships between officers of different grades.
United States v. Kroop, 38 MJ 470 (CMA 1993), is our most recent precedent governing relationships between officers of different ranks. Kroop involved a charge of “undue familiarity” and “excessive social contacts” between a married male lieutenant colonel (LtCol) and a married female second lieutenant detailed to his squadron. LtCol Kroop pled guilty to the Charge but challenged the findings on appeal. The Court of Military Review affirmed the findings only insofar as the Charge pertained to adultery and set aside that portion of the findings concerning “undue familiarity” and “excessive social contacts.” 34 MJ at 634-36. The Judge Advocate General certified the case to our Court.
The opinion of Senior Judge Everett, joined by Judge Wiss, addressed two aspects of the Charge. First, it stated that “[i]n the absence of further allegations as to the details of the conduct involved or the service custom violated, we are concerned about the imprecision of this language.” 38 MJ at 472. Second, it noted that in 1989, at the time of the charged conduct, “no custom of that service” and “no Air Force Regulation prohibited such conduct.” Id. at 473. Judges Ever *260 ett and Wiss concluded that neither Article 133 nor Article 134 was violated by “private sexual intercourse between an officer and his or her superior, unaccompanied by any element of harassment or coercion on the part of the superior and any allegation of violation of an applicable custom or regulation____” Id.
Chief Judge Sullivan concurred in part and in the result, limiting his views to agreement with a comment by Senior Judge Everett that the language excised by the Court of. Military Review could be viewed as “surplus-age” in the context of an adultery charge. Id.
Judge Gierke, in dissent, stated that the allegation of “undue familiarity” and “excessive social contacts” with a married female servicemember was sufficient to state an offense under Article 133. He noted: (1) the case involved a guilty plea in which the accused had not challenged the sufficiency of the specification at trial; (2) under those circumstances, the standard of review as to legal sufficiency was lower on appeal than in a case where the specification had been challenged at trial; and (3) the accused had not asked for a bill of particulars or in any way asserted at trial that the specification was too vague. Id. at 474-75.
Judge Cox expressed agreement “with almost everything” in Judge Gierke’s dissent, but he concurred in the result because he viewed the decision of the Court of Military Review as doubting that “this particular conduct was of such a character as to rise to conduct unbecoming an officer.” Id. at 473.
In view of the split opinions in Kroop and the fact that it was viewed as involving private behavior, it does not provide a precedent that would clearly govern the present case. At a minimum, Kroop suggests that pleading and proof of a custom or regulation, or production of a bill of particulars, may be sufficient to rebuff a challenge to such a specification in a contested case.
Subsequent to our decision in Kroop, the Air Force revised Instruction (AFI) 36-2909, entitled “Fraternization and Professional Relationships,” effective February 20, 1995. The parties to the present case agree that the 1995 version of the Instruction was non-punitive, in the sense that violations were not punishable under Article 92, UCMJ, 10 USC § 892 (failure to obey a lawful order or regulation).
With respect to officers, the 1995 Instruction defined “[Unprofessional Relationships” as “[pjersonal relationships between officers ... which result in inappropriate familiarity or create the appearance of favoritism, preferential treatment, or impropriety.” Para. Al.1.2. With respect to officers within the same chain of command, unit, or closely related unit, the Instruction noted:
Personal relationships between members of different grades or positions within an organization or chain of command can easily become unprofessional. Dating and indebtedness commonly get out of hand because they appear to create favoritism or partiality. Consequently, senior members should not date or become personally obligated or indebted to junior members. This is also because seniors have, or are perceived to have, authority to influence the junior member’s career.
Para. A1.3.1. The Instruction also defined fraternization (officer-enlisted relationships) and noted that fraternization was subject to criminal prosecution under the UCMJ as service discrediting and prejudicial to good order and discipline. Para. Al.1.3. No such language was included with respect to unprofessional relationships between officers; rather, the Instruction simply noted that such relationships “become a matter of official concern.” Para. A1.3.2.[1]
The current version of AFI 2909 (1 May 1999), issued subsequent to the events at issue in this appeal, contains a more detailed *261 description of the nature of unprofessional relationships. In addition, the new Instruction indicates that commanders will use “a stepped approach to enforcement of the policy” regarding unprofessional relationships. Id. (Summary of Revisions). Under the stepped approach, a commander first will issue an order “to cease an unprofessional relationship”; then, if the officer does not adhere to the order, the commander will consider “prosecution under the UCMJ for violation of the order.” Para. 4. The two-step approach is reinforced in paragraph 8 of the Instruction, “Actions in Response to Unprofessional Relationships,” which provides that corrective action
should normally be the least severe necessary to terminate the unprofessional aspects of the relationship. The full spectrum of administrative actions is available and should be considered.... Experience has shown that counseling is often an effective first step in curtailing unprofessional relationships____ An order to terminate a relationship, or the offensive portion of a relationship, can and should be given whenever it is apparent that lesser administrative action may not be effective. Officers or enlisted members who violate such orders are subject to action under the UCMJ for violation of the order.
This current Instruction reflects a recognition by the Air Force that it is difficult to provide a definitive set of rules governing the wide variety of personal interactions between officers of different ranks, and that an order can serve to focus the attention of an officer on the limits of his or her relationships with particular subordinates.
In a case such as this, where there has been a bill of particulars, it is not necessary to address the question of whether the specification, standing alone, provides sufficient notice that the conduct in question was proscribed by Article 133. Instead, it is appropriate to look at the bill of particulars in conjunction with the guidance in the Instruction, the Manual, case law, or custom.
During the initial stages of the trial, the defense moved to dismiss the specification at issue on the grounds that it failed to state an offense. The Government responded by furnishing a bill of particulars.[2]
The centerpiece of the bill of particulars was item 4, the allegation that 1Lt Clemm admitted to Major Cloutier that she was having an affair with appellant. The balance of the bill of particulars involved circumstantial evidence from which inferences could be drawn corroborating the existence of an affair and its negative impact on the command.
The bill of particulars was more than sufficient to provide adequate notice of conduct unbecoming an officer and a gentleman. Whatever limits there may be on the reach of Article 133 into discreet, private conduct, the *262 circumstances referenced in the bill of particulars were well within the range of conduct proscribed by military law. I am confident that no field grade officer holding a position of command in any of the armed forces could have reasonably believed in 1995 that he or she would not risk a court-martial for having an affair with a subordinate junior officer under the circumstances described in the bill of particulars.
II. Legal Sufficiency of the Evidence
A bill of particulars may provide the basis for sustaining the legal sufficiency of a charge, but it does not address the legál sufficiency of the evidence actually introduced on the merits. At trial, 1Lt Clemm denied that she had been involved in an affair with appellant, and she denied making a statement to Major Cloutier admitting to such an affair. As a result, the only evidence of her statement was Major’s Cloutier’s assertion that 1Lt Clemm had, in fact, made such an admission.
The military judge ruled that Major Cloutier’s recollection of her statement constituted hearsay that was inadmissible on the merits of the Charge, although he permitted it to be used, under proper limiting instructions, as a prior inconsistent statement to impeach 1Lt Clemm’s trial testimony denying the affair. See Mil.R.Evid. 613, Manual, supra. Because it was excluded as substantive evidence on the merits, her statement may not be considered during appellate review of the question whether the evidence was legally sufficient to support the charged offense.
Absent her admission, the remainder of the prosecution’s case consisted of a variety of incidental touchings, social encounters, warnings to appellant about the impact of his interactions with 1Lt Clemm on the discipline and morale of the unit, and appellant’s actions in response to those expressions of concern. Without her admissions, the evidence reflected the speculation of others as to the possibility of an inappropriate relationship, but did not provide a legally sufficient basis upon which a reasonable factfinder could have concluded, beyond a reasonable doubt, that appellant’s conduct with 1Lt Clemm crossed the line from permissible interaction to an illegal unprofessional relationship of inappropriate familiarity. See United States v. Turner, 25 MJ 324 (CMA 1987), citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
That conclusion, however, does not mean that the Air Force was precluded from holding appellant accountable for his conduct. Aside from the plethora of administrative actions that could have been taken with respect to matters such as efficiency reports, assignments, and promotions, appellant could have been held accountable in a court-martial for the offense of dereliction of duty under Article 92 or as a related charge under Article 133. The evidence makes abundantly clear that, from the outset of appellant’s interactions with 1Lt Clemm, members of his command repeatedly called his attention — as squadron leader — to the deleterious impact of these interactions on the good order and discipline of the unit. Although these admonitions were brought to appellant’s attention with increasing frequency and bluntness, he not only chose to ignore these expressions of concern — but he also willfully engaged in conduct that further undermined the morale of the unit, a unit actively engaged in combat operations. As squadron leader, he had a particular responsibility to set an example. Instead of conducting himself in a manner that would ensure that his interactions with 1Lt Clemm were limited to those necessary for their professional relationship, he repeatedly placed himself in situations which affected morale within the unit and which caused reasonable concern among the officers and enlisted members of his unit. Rather than making it clear to his subordinates that his relationship with 1Lt Clemm was confined to professional interaction, he inflamed the situation through comments suggesting that he viewed her as a sexual object rather than as a military officer.
This is not a case of an isolated remark in a private conversation, nor does it involve a stray, careless or thoughtless act. It also does not involve a relationship in which the parties endeavored to act with discretion and circumspection. The case before us involves a commanding officer who — knowing of con *263 cerns within his unit about his relationship with a subordinate — repeatedly acted with flagrant disregard of the consequences upon his unit that would result from his remarks and his visible interactions with that subordinate.
Under the circumstances of this case, I would have had no difficulty in concluding that a reasonable fact-finder could have found that appellant did not conduct himself as an officer and a gentleman when he permitted the degradation of the morale, good order, and discipline of his unit by taking actions that further aggravated the reasonable concerns of members of his unit and that had been repeatedly called to his attention. Given the way the ease was charged and prosecuted, however, it would be difficult to hold that a dereliction charge would be fairly embraced within the Charge. In light of the Government’s decision to center its prosecution on the existence of an inappropriate relationship rather than on appellant’s dereliction of duty, I would dismiss the Charge and remand the ease for a rehearing on sentence.

. Paragraph 2 of the Instruction directed commanders to take the following “corrective action” with respect to relationships having an adverse effect on their units:
2.1 Consider administrative actions....
2.2 Consider punitive action, when appropriate, especially for favoritism, partiality, or misuse of grade or position, which may be violations of the Uniform Code of Military Justice (UCMJ). Fraternization is a violation of the UCMJ.

. The bill of particulars identified the following circumstances in support of the Charge:
1. Testimony surrounding the 21 November 1995 Thanksgiving party in Caorle, Italy. This includes the ride back to Pordenone, Italy, statements made by the accused in the elevator to Captain Hughes and the subsequent gathering in Major Cloutier’s hotel room.
2. Observations in November and December 1995 from members of the squadron concerning frequency of off-duty contacts between the accused and his subordinate Intelligence Officer, lLt [First Lieutenant] Clemm.
3. Testimony that the accused and lLt Clemm spoke to each other on the telephone from their respective hotel rooms in the middle of the night on more than one occasion.
4. Lt Clemm's statements to Major Cloutier admitting to having an affair with the accused and her inability to stop the affair.
5. Testimony from various squadron personnel concerning their perceptions of the accused and 1Lt Clemm as they pertain to confrontations with the accused and his reactions to their confrontations.
6. Statements that 1Lt Clemm made to Captain Lovrak that “you warned me about [other aircrew] but you didn’t warn me about LtCol Rogers.”
7. Statements made by the accused to Major Cloutier concerning the “dice poker chip.”
8. Statements by the accused while on his cellular phone to Major Hume that he was in [the] mountains with a beautiful woman, and a statement to Major Cloutier that "we” are in the mountains.
9. Major Durtschi’s observations of the accused and lLt Clemm riding in a car together on a non-duty day in civilian clothes.
10. Failure of the accused to advise 1Lt Clemm to have her room changed again when he discovered that she had moved into the room next to his.